IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| P.M., and W.M.,<br><br>      Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00507-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, and is before the court on the parties' cross-motions for summary judgment. The court has also reviewed the notice of supplemental authority and response filed by the parties. The complaint filed by plaintiffs P.M. and W.M. (collectively, "Plaintiffs") alleges two causes of action: (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) ("benefit denial claim") and (2) violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3) ("Parity Act claim").

On September 15, 2023, Plaintiffs moved for summary judgment on both claims. A month later, United Healthcare Insurance ("United") and United Behavioral Health ("UBH") (collectively, "Defendants") moved for summary judgment. For the following reasons, Plaintiffs' Motion is **GRANTED**, and Defendants' Motion is **DENIED**. The court orders Defendants to pay for W.M.'s treatment at Innercept from December 4, 2019 through May 23, 2020.

## BACKGROUND

This dispute involves the denial of benefits allegedly due to Plaintiffs under their ERISA employee group health benefit plan ("the Plan"). *See* ECF No. 2 ("Compl."). Under the Plan, United is the insurer and claims administrator while UBH is responsible for authorizing benefit coverage for mental health and substance use disorder services. *See* Compl. ¶ 2; Administrative Record ("AR") at 417. At all relevant times, P.M. was a Plan participant and his son, W.M., was a Plan beneficiary. *See* Compl. ¶ 3.

Plaintiffs sought care for W.M.'s mental health conditions at Innercept, a 24-hour residential treatment center ("RTC"), from November 14, 2019 until June 17, 2020. *See* Compl. ¶ 4. On December 6, 2019, UBH sent Plaintiffs a letter denying coverage for W.M.'s care at Innercept from December 4, 2019 onward. *See* AR at 417. Plaintiffs claim Defendants' wrongful denial of benefits caused them to incur over $90,000 in unreimbursed medical expenses. *See* Compl. ¶ 36.

**I.  THE PLAN**

The Plan offers benefits for covered services that are medically necessary, which includes residential treatment. *See* AR at 1733, 1742. The Plan was issued in the state of Illinois and gives Defendants discretion to interpret the Plan's terms and make factual determinations regarding the Plan. *See id.* at 1723, 1730.

United determines whether a mental health service is medically necessary by referencing the Optum Level of Care Guidelines ("the Guidelines"). *See id.* at 125. The Guidelines define medically necessary services as treatment that is "[c]onsistent with generally accepted standards of clinical practice," "[c]onsistent with services backed by credible research soundly demonstrating that the service(s) will have a measurable and beneficial health outcome, and are

therefore not considered experimental," "[c]onsistent with Optum's best practice guidelines," and "[c]linically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks." *Id.* at 126.

The Guidelines also establish admission, continuing stay, and discharge criteria for RTC level of care. *See id.* at 139-40. Admission to a residential treatment facility is appropriate when "[s]afe, efficient, effective assessment and/or treatment of the member's condition requires the structure of a 24-hour/seven days per week treatment setting." *Id.* at 139. Examples include when a member's "behavior or cognition interferes with activities of daily living to the extent that the welfare of the member or others is endangered" or when psychosocial and environmental problems are present that are likely to interfere with the member's safety or undermine treatment at a less intensive level of care. *Id.* Continued care in a residential treatment center is suitable when "admission criteria continue to be met," "active treatment is being provided," and "treatment is not primarily for the purpose of providing custodial care." *Id.* at 127, 140. To qualify for discharge from any level of care under the Guidelines, the continued stay criteria must no longer be met. *See id.* at 127.

Finally, the Plan contains a provision regarding the timeframe for filing claims. *See id.* at 1775. Plan participants or beneficiaries must submit a claim for services to United within 90 days after the patient receives the services for which payment is being requested. *See id.*

## II. W.M.'S CONDITION AND TREATMENT

W.M. was born prematurely at 33 weeks and began to show signs of mental health conditions in preschool. *See id.* at 394. In January of 2010, W.M. was diagnosed with attention deficit hyperactivity disorder (ADHD) and prescribed Adderall. *See id.* He also received academic accommodations for his diagnosis throughout his time in elementary, middle, and high school. *See*

3

*id.* As a teenager, he saw a psychiatrist, Dr. Zachary Solomon, for his issues with depression and self-esteem. *See id.* He also engaged in marijuana and alcohol use beginning in high school and continuing throughout college. *See id.* at 395.

While attending Indiana University, W.M. became more anxious and depressed, medically withdrawing during the first semester. *See id.* Although he registered for classes his second semester, he continued to experience symptoms and was physically ill for much of the semester. *See id.* He started to receive treatment from Dr. Solomon again during this time. *See id.* In May of 2019, Dr. Solomon informed W.M.'s parents that he believed W.M. "was suffering from a psychotic breakdown, [and] suspected that [W.M.] may have schizophrenia or schizoaffective disorder." *Id.* W.M.'s parents reported that W.M.

> increasingly described odd and delusional thoughts, displayed severe paranoia, and withdrew socially. At times, he would become catatonic, staring at nothing and not communicating at all. Other times, he believed that he had special energies and powers (such as the power to see out of the whites of his eyes, or to see someone's brains), was fearful of the sun and would buy or borrow a great number of books, often of unusual content, but would not be able to sustain any interest in them. During these times, he would wander for hours outside in the middle of the night in cold, rainy weather, lose his phone, and put himself in dangerous situations.

*Id.* In addition to these symptoms, W.M. developed a gambling problem. *See id.* at 605.

After experiencing an episode of acute psychosis and aggression, W.M. was hospitalized at the NorthShore University Health System from August 5, 2019 through August 12, 2019. *See id.* at 458. There, W.M. was diagnosed with "acute psychosis, schizoaffective disorder, unspecified type." *Id.* After this diagnosis, W.M. was seen at NorthShore again on October 11, 2019, and hospitalized from October 29, 2019 through November 8, 2019 in the Compass Health partial hospitalization program. *Id.* at 395-96, 537-38. On November 14, 2019, W.M. was admitted to Innercept where he received treatment until his discharge on June 17, 2020. Compl. ¶ 4.

Upon admission at Innercept, W.M. was provisionally diagnosed with persistent depressive disorder, ADHD, generalized anxiety disorder, and gambling disorder. *See* AR at 1445. During his stay, W.M. attempted to run away on multiple occasions. *See id.* at 1094. In these attempts, W.M. sought to break into neighbors' cars as well as Innercept staff cars. *See id.* at 1092. On one attempt to run away in December, W.M. was arrested for burglary of a golf pro shop and providing false information to police. *See id.* at 563-569. Due to these incidents and W.M.'s general condition, W.M.'s treating psychologist at Innercept, Dr. George Ullrich, recommended he be placed under the guardianship of his parents. *See id.* at 1083. Dr. Ullrich reasoned that

> mental health concerns, past substance use and dependency, addictions, and exacerbation in symptomology significantly impair his judgment and ability to make decisions in regard to his psychiatric, physical safety, and how to manage or maintain himself safely in the community. It is my professional opinion that [W.M.] is an incapacitated person, secondary to mental health concerns delaying the usual age-appropriate development of judgment.

*Id.* As a result of the letter, W.M.'s parents petitioned to be appointed as general co-guardians of W.M. in early 2020. *See id.* at 591-601.

**III.   DENIAL OF BENEFITS AND PRELITIGATION APPEALS**

Defendants covered W.M.'s treatment at Innercept from November 14, 2019 to December 3, 2019. *See id.* at 4-18. On December 6, 2019, UBH informed Plaintiffs of its decision not to authorize any further coverage for W.M.'s treatment at Innercept from December 4, 2019 onward. *See id.* at 107. UBH provided Plaintiffs with the following justification:

> You were admitted for mood concerns and not thinking clearly. After talking with your doctor's designee, it is noted you have made progress and that your condition no longer meets Guidelines for further coverage of treatment in this setting. You are medically stable. You are adherent to medications. You appear not to have self-harm thoughts or thoughts to harm others. You can continue treatment at a lower level setting. Instead, your care and recovery could continue care in the Mental Health Intensive Outpatient Program setting.

*Id.* Despite UBH's denial of coverage, Plaintiffs continued to seek care for W.M. at Innercept until his discharge on June 17, 2020. *See* Compl. ¶ 4.

Plaintiffs appealed UBH's decision on May 29, 2020. *See* AR at 391. On June 22, 2020, UBH upheld the denial of coverage "[b]ased on the Optum Level of Care Guideline for the Mental Health Residential Level of Care." *Id.* at 179. UBH provided the following further justification:

> You were admitted for treatment of mood and thought disorder. After reviewing the medical records, it is noted that your condition no longer met Guidelines for coverage of treatment in a Mental Health residential setting. You were cooperative, responsive to staff, medication adherent, and doing better. You presented no acute behavioral management challenges. You had no acute suicidal or self harm thinking; no self harmful behaviors are reported. You posed no risk of harm to others – you were not homicidal, threatening, or aggressive. No serious mood disturbance was present; No medication changes which required 24 hour care occurred. You had no evidence of severe post acute withdrawal symptoms. You were medically stable. Community support was available. Care could have continued in a less restrictive setting. You could have continued care in the mental health Partial Hospitalization (PHP) setting.

*Id.* at 179-80. On August 9, 2022, Plaintiffs filed this lawsuit. *See* Compl.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, when both parties move for summary judgment in an ERISA proceeding focusing on a benefit denial claim, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life,* 605 F.3d 789, 796 (10th Cir. 2010) (internal quotations omitted). In these instances, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (internal quotations omitted).

By contrast, "the court affords parties no deference in interpreting the Parity Act because the interpretation of a statute is a legal question." *Theo M. v. Beacon Health Options*, 631 F. Supp. 3d 1087, 1100 (D. Utah 2022). Thus, the court will "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

The cross-motions for summary judgment present several issues for the court's analysis. The court begins by addressing the proper standard of review for the denial of benefits claim in this case. The court then applies the de novo standard to Plaintiffs' claim for denial of benefits at Innercept.[1] The court then turns to Plaintiffs' Parity Act claim.

I.     ERISA DENIAL OF BENEFITS CLAIM

   A.     STANDARD OF REVIEW

When an ERISA-governed plan gives the administrator discretionary authority to determine benefits eligibility, reviewing courts apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1294 (10th Cir. 2023) (citing *LaAsmar,* 605 F.3d 789).

Here, the Plan gives Defendants discretion to interpret the Plan's terms and make factual determinations regarding the Plan. *See* AR at 1730. However, the Plan was issued and underwritten by United Healthcare Insurance company of Illinois. *See id.* at 1723-25. Therefore, Defendants argue, the court should not apply the arbitrary and capricious standard because Illinois regulations

---

[1] The court would reach the same conclusion applying the arbitrary and capricious standard to Plaintiffs' denial of benefits claim.

invalidate the Plan's discretionary clause. *See* ECF No. 37 ("Defs.' Mot.") at 19 n.5. Specifically, the Illinois Administrative Code prohibits discretionary clauses in healthcare plans:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, by a health carrier, to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services or of a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

50 Ill. Adm. Code § 2001.3 ("Section 2001.3").

The recognized purpose of Section 2001.3 is "to protect consumers from having their benefits determinations reviewed under an arbitrary and capricious standard." *Kaferly v. Metro. Life Ins. Co.*, 189 F. Supp. 3d 1085, 1093 (D. Colo. 2016) (internal quotations omitted) (applying de novo review to an ERISA denial of benefits claim where the plan was issued under Illinois law); *see also Garvey v. Piper Rudnick LLP Long-Term Disability Ins. Plan*, 2011 WL 1103834, at *2 (N.D. Ill. Mar. 25, 2011) ("The express purpose of Section 2001.3 in prohibiting discretionary clauses was to ensure that courts would apply de novo review in ERISA cases where the denial of benefits is challenged."). Illinois courts have applied de novo review to ERISA benefit denials based on Section 2001.3's prohibition. *See, e.g.*, *Borich v. Life Ins. Co. of N. Am.*, 2013 WL 1788478 (N.D. Ill. 2013); *Ehas v. Life Insurance. Co. of N. Am.*, 2012 WL 5989215 (N.D. Ill. 2012); *Barrett v. Life Insurance. Co. of N. Am.*, 868 F. Supp. 2d 779 (N.D. Ill. 2012); *Zuckerman v. United of Omaha Life Ins. Co.*, 2012 WL 3903780 (N.D. Ill. 2013). Due to the bar against discretionary clauses in healthcare plans under Illinois law, the court will proceed under de novo review.

"When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision. The administrator's decision is accorded no deference or presumption of correctness." *Niles v. Am.*

8

*Airlines, Inc.*, 269 F. App'x. 827, 832 (10th Cir. 2008) (internal quotations omitted). The de novo "standard is not whether substantial evidence or some evidence supported the administrator's decision." *Id.* at 833 (internal quotations omitted). Rather, "it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Id.*

Plaintiffs argue that the court should limit its analysis to the specific rationales for denying benefits that United articulated on the record. *See* ECF No. 42 ("Pls.' Resp.") at 6. The court need not reach this issue. Here, the court need only consider whether W.M.'s treatment was medically necessary under the terms of the Plan, and Defendants made this argument in their denial letters.

The court takes note, however, that although Defendants raised the issue of medical necessity, they failed to support their argument with any evidence in the prelitigation appeals process. Defendants' denial letters only provided Plaintiffs with conclusory statements and made no reference to supporting evidence. In doing so, Defendants clearly violated ERISA's implementing regulations requiring a "full and fair review." 29 C.F.R. § 2560.503-1(h)(1).

Furthermore, de novo review ordinarily limits courts to consider evidence on the record. *See Hall v. UNUM Life Ins. Co.*, 300 F.3d 1197, 1202 (10th Cir. 2002); *see also Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1309 (10th Cir. 2007) (emphasizing that "ERISA policy strongly disfavors expanding the record beyond that which was available to the plan administrator"). In failing to adequately engage with Plaintiffs in the prelitigation appeals process and provide evidence in support of their decision, Defendants not only violated ERSIA regulations, but handicapped their own argument for the court to consider. It would behoove Defendants to meaningfully engage with claimants in the future and develop the record beyond simple conclusory statements.

B.     **DENIAL OF BENEFITS FOR TREATMENT AT INNERCEPT**

Under the de novo standard, Plaintiffs argue that the preponderance of the evidence supports that W.M.'s treatment at Innercept was medically necessary. *See* ECF No. 20 ("Pls.' Mot.") at 43. The court agrees and finds that W.M.'s treatment at Innercept, when he was denied coverage by Defendants, was medically necessary.

There is no dispute that W.M. needed medical care. Rather, the question is whether the level of care W.M. received at Innercept was the proper level of care under the Plan's definition of "medical necessity" from December 4, 2019 onward. Defendants argue that the RTC level of care was not medically necessary for W.M.'s condition and that he could have received a lower level of care to treat his symptoms. *See* Defs.' Mot. at 20.

To qualify for RTC level of care under the Guidelines, the patient must require 24-hour care for symptoms that interfere with daily life to the extent the patient's welfare is endangered or the patient presents psychosocial or environmental factors that would undermine treatment at a lower level of care. *See* AR at 139. In applying these Guidelines and denying coverage, Defendants presented the following arguments that 24-hour care was not necessary: W.M. was medication compliant, cooperative and responsive to staff, exhibited no risk of self-harm or harm to others, and presented no acute behavioral management challenges. *See id.* at 179-80.

However, both medical opinions submitted by Plaintiffs in their appeal as well as clinical evaluations on the administrative record demonstrate that W.M. did not understand the need for medication or treatment for his mental health disorders and continued to exhibit a high risk of self-harm and harm to others. Furthermore, Plaintiffs offered evidence that W.M. had previously attempted treatment at a lower level of care and failed to see results. For these reasons, multiple medical professionals recommended W.M. continue the level of care he was receiving at Innercept. As such, Plaintiffs claim for benefits is supported by a preponderance of the evidence.

> 1) *Plaintiffs have demonstrated that RTC level of care was the appropriate level of care for W.M.'s condition.*

Plaintiffs argued in their appeal that RTC was the appropriate level of care, in part, because they had attempted to treat W.M.'s condition at a lower level of care for years and had failed. *See* AR at 400. To support that Innercept was the appropriate level of care for W.M., Plaintiffs submitted two letters of medical necessity in their appeal: a letter from Dr. Solomon dated May 8, 2020, and a letter from Imy Wax, an independent Therapeutic and Educational Consultant who Plaintiffs consulted prior to W.M.'s admission to Innercept. *See* AR at 397-403.

In his letter, Dr. Solomon stated that when W.M. was admitted to Innercept, "[t]he need for a residential psychiatric program was clear, [W.M.] was uncooperative with ongoing treatment, placed himself and others at risk due to bizarre, disorganized behavior and he had no insight into his illness." *Id.* at 456. Dr. Solomon further explained that during W.M.'s stay at Innercept, "[h]e has had at least one incident while in the program that demonstrates his ongoing need for residential psychiatric care," and that "should he be discharged from residential care at this time, my best prediction is that he will end up in the penal system due to repeated infractions of law secondary to delusions and poor insight." *Id.*

Similarly, Imy Wax's letter noted that "[o]utpatient therapeutic interventions had not been adequate in addressing [W.M.'s] needs or stabilizing him emotionally or psychologically" and that "[W.M.'s] parents took the appropriate steps in terms of increasing levels of care as a response to [W.M.'s] increasingly dangerous behavior." *Id.* 542. Wax further explained that

> [a]s a result of this evaluation and the complexity of the clinical issues that [W.M.] faced, I recommended that he attend a residential therapeutic setting that specializes in working with young adults with significant emotional dysregulation and/or psychiatric disorders. It was clear that [W.M.] needed an inpatient, clinically sophisticated, therapeutic setting with excellent clinical oversight.

*Id.*

Defendants argue that neither of these letters establish medical necessity because both professionals treated W.M. prior to his admission at Innercept. *See* Defs.' Mot. at 26. Indeed, letters based on "outdated information," or reports of a member's experience are "not a clinical assessment" and thus insufficient to establish medical necessity. *Christine S. v. Blue Cross Blue Shield of N.M.*, 2021 WL 4805136, at *22 (D. Utah 2021). However, the failure of a professional opinion to establish a clinical finding of medical necessity does not preclude a court from considering the opinion. *See id.* (considering the member's treating professionals' opinions but ultimately remaining unconvinced that the member required RTC level of care).

Here, the opinions may not independently establish medical necessity, but they do more to support Plaintiffs' claim than the opinions put forth by the plaintiffs in *Christine S.* First, there is less evidence on the record here to refute Plaintiffs' claim to medical necessity. *See Christine S.*, 2021 WL 4805136, at *22 ("This is not an instance where [Defendants] had 'little or no evidence in the record to refute [Plaintiffs'] theory.'") (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)). Second, neither of the letters put forward by Plaintiffs "bolster the conclusion that [Plaintiff's] condition met… criteria for discharge." *Christine S.*, 2021 WL 4805136, at *21. Furthermore, the letters, although not clinical findings of medical necessity, support Plaintiffs' argument that RTC was the appropriate level of care given W.M.'s previous failures to remedy his symptoms at a lower level of care. These letters provide persuasive evidence about the severity of W.M.'s symptoms leading to his admissions at Innercept as well as the justification for why RTC was the right level of care at the time.

Given this evidence, it is questionable whether W.M. would be able to sufficiently address his symptoms in three weeks of RTC care, thus allowing him to return to outpatient treatment as Defendants recommended in their denial. *See* AR at 107. In fact, the record leading up to

12

Defendants' denial of benefits shows that W.M.'s symptomatic progress was disputable. The same day W.M. was denied RTC level of care on December 4, 2019, he was still living in the stabilization cabin as a result of his attempts to run away from Innercept. *See id.* at 1058. The day prior, Innercept reported W.M.'s "current functioning level" to be "[i]mpulsive: [d]epressed, anxious, confused and/or often upset. Feels out of control, suicidal and/or harms self." *Id.* at 1061. The same week, his therapist reported that although he hoped W.M. would move back to the main house soon, he "still hasn't gotten the message that he is not the one calling the shots here and is extremely frustrated by that." *Id.* at 1069. These reports on W.M.'s condition demonstrate that W.M. did not qualify for discharge to a lower level of care under the Guidelines standard.

> 2) *Plaintiffs have established that W.M. required RTC level of care because he did not understand the need for medication or treatment.*

The record also confirms that multiple treating medical professionals had concerns about W.M.'s medication compliance and understanding of the need for treatment. Dr. Solomon noted in his letter that W.M.'s psychiatrist at Innercept told Dr. Solomon that the Innercept treatment team has "struggled to find a helpful medication regiment" and that W.M.'s "bizarre behavior has diminished but no real insight has been gained unfortunately (he still does not appreciate the need for medication)." *Id.* at 456.

W.M.'s treating psychiatrist at Innercept, Dr. Ullrich, shared similar concerns. In a report dated January 7, 2020, Dr. Ullrich explained "whenever you spoke to [W.M.] he did not agree that he needed treatment. He often will try to literally talk about bribing his therapist to help him get out or talk to his peers about how they could help him. He continues to focus on ways of getting out of treatment instead of ways of addressing the issues that led him to being in treatment." *Id.* at 1038. W.M.'s inability to accept his need for treatment and medication presented a "psychosocial… problem that [is] likely to threaten [W.M.'s] safety or undermine engagement in

13

a less intensive level of care without the intensity of services offered in [the RTC] level of care." *Id.* at 139 (stating the Guidelines' admission criteria for RTC level of care). Thus, Plaintiffs adequately demonstrated the need for 24-hour care services to manage W.M.'s symptoms.

> 3) *Plaintiffs have established that W.M. required RTC level of care because he continued to exhibit a risk of self-harm and harm to others.*

Defendants argue in their motion that W.M.'s treatment at Innercept was not medically necessary, in part, because "W.M. did not exhibit active thoughts of harming himself, homicidal ideation, or self-injurious behaviors." *See* Defs.' Mot. at 21. While W.M. may not have exhibited active thoughts of suicide, multiple medical professionals recommended RTC level of care after expressing concerns that W.M. posed a high risk to himself and others.

W.M. was evaluated during parental guardianship proceedings by Dr. Philip Hanger on February 27, 2020. *See* AR at 616-27. In his report, Dr. Hanger recommended that W.M.'s treatment team, family, and healthcare providers continue to monitor his suicide risk, explaining that, "[w]hile [W.M.] has not identified an imminent intent to harm himself, his impaired capacity to regulate his emotional and behavioral responses, confounded by his delusional ideation, as well as his admitted, continual suicidal thoughts, elevate his risk of a future self-harm action." *Id.* at 627. Dr. Hangar also recommended W.M. be placed under guardianship due to his incapacitation "associated with the functional impairment brought about by his serious mental illness involving a psychotic thought process." *Id.* As such, Dr. Hanger concluded, "[t]he least restrictive residential placement recommended to maintain [W.M.]'s safety and wellbeing is considered to be within an intensive, residential treatment program, such as his current placement, where he may be ensured of continuing to obtain consistent application of medication and counseling services." *Id.*

Dr. Ullrich also reported concerns with W.M.'s risk to himself shortly after Defendants denied coverage at Innercept. On December 17, 2019, Dr. Ullrich conveyed that W.M. "remains at

chronic risk of acting in a manner that could place himself and others at risk and appears to have little understanding of his disorder need for medicines or treatment." *Id.* at 1048.

While Defendants point to reports from W.M.'s therapist, Stephan Yates, to show W.M. was not at risk of harm to himself or others, the court finds these citations unpersuasive. Defendants cherry pick notes that W.M. was at minimal risk of self-harm or that he was in a "positive head space." *See* Defs.' Mot. at 21. But in doing so, Defendants fail to consider the larger context or other opinions of W.M.'s treating professionals. For example, when Defendants cite to the record that W.M. appeared to be in a "positive head space," they pull from a note that was recorded the day after W.M. was released from jail for burglarizing a golf pro shop and providing false information to police officers. AR at 1034. Dr. Ullrich describes this incident in one of his reports, noting that W.M. refused to follow police instructions creating a "very dangerous circumstance" in which numerous police were called to restrain W.M. *Id.* at 1038. At the point that W.M. "appeared to be in a positive headspace," he was isolated in the stabilization cabin, as a result of his confrontation with the police. *Id.* at 1034-36.

An isolated incident does not demonstrate a need for RTC level of care. *See Christine S. v. Blue Cross Blue Shielf of N.M.*, 2021 WL 4805136 (D. Utah 2021) (denying medical necessity despite patient's attempt to run away). However, the record indicates that most, if not all, of W.M.'s treating professionals expressed concerns that the burglary incident was not isolated and that if W.M. did not receive RTC level of care, these behaviors would continue to pose a risk to both W.M. and the public. Furthermore, evidence that a patient has improved or had good days does not disprove medical necessity, and "Plaintiffs need only show medical necessity by a preponderance of the evidence." *L.D. v. United Healthcare Ins.*, 684 F. Supp. 3d, at 1197-98. In sum, Plaintiffs

15

have satisfied their burden that treatment at Innercept was medically necessary for some period after Defendants denied coverage.

### C. REMEDY

Upon finding an ERISA violation de novo, the court may reverse a claim denial and award benefits, or it may remand to the plan administrator for a renewed evaluation of the insured's claim. *See Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1327 (10th Cir. 2009) ("[U]nder de novo review, remand to the administrator is an available remedy but it is not always the appropriate one."). Generally, remand is appropriate when the ERISA violation was the result of a claim denial with inadequate factual findings or explanation. *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1315 (10th Cir. 2023). "But if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." *Id.* (citation omitted).

Here, the record clearly indicates that W.M.'s treatment at Innercept was medically necessary past Defendants' denial on December 4, 2019. Thus, remand is unnecessary. Defense counsel agreed during oral argument that remand would not be an appropriate remedy if the court upheld W.M.'s claim for medical benefits on de novo review. However, the record only contains evidence of medical necessity until May 23, 2020. Plaintiffs failed to exhaust their claims from May 24, 2020 to June 17, 2020. Therefore, the court orders Defendants to pay for W.M.'s treatment at Innercept from December 4, 2019 through May 23, 2020.

## II. PARITY ACT CLAIM

Plaintiffs' second claim is that Defendants violated the Parity Act by applying more stringent medical necessity criteria for intermediate level mental health treatment benefits than analogous intermediate levels of medical or surgical benefits. *See* Compl. ¶ 48. The court has already awarded benefits on Plaintiffs' first claim, and Plaintiffs have failed to identify any additional remedy that could be ordered. The court cannot decide the Parity Act Claim on the mere

possibility of a future denial of benefits. *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-581 (1985) (holding that Article III does not grant courts power to decide potential controversies that rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all"). The court has no basis to know whether Defendants will continue to deny coverage or whether W.M. will need residential treatment care in the future. The court therefore declines to address the Parity Act claim on grounds of mootness. *See Theo M. v. Beacon Health Options*, 631 F.S Supp. 3d 1087, 1110-11 (D. Utah 2022).

## CONCLUSION AND ORDER

For the reasons set forth above, the court **GRANTS** Plaintiffs' motion for summary judgment on their denial of benefits claim and **DENIES** Defendants' motion for summary judgment. The court does not address the parties' cross motions for summary judgment on the Parity Act claim. The court orders Defendants to pay for W.M.'s treatment at Innercept from December 4, 2019 through May 23, 2020.

DATED September 23, 2024

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge